Good morning to all counsel. You can see we have a very, very long calendar today. So we're going to do our best to hold everybody to their time limit. I do want to thank those those lawyers who were scheduled originally to have your case argued on Friday. Tomorrow, who on short notice are having your cases moved to today because we are like other institutions, observing the day of mourning for President Reagan's death tomorrow and the court will be officially closed with that. And we will take the cases in the order listed on the calendar with the following cases either submitted or taken off calendar. Pavlovich versus Ashcroft is submitted on the briefs. Rubin versus Pringle has been continued. Yen versus Ashcroft has been voluntarily dismissed. Bogdan versus Ashcroft is submitted on the briefs. So the first case for argument then is Zace versus Ashcroft. Good morning, Your Honor. May it please the Court. My name is James Patterson. I represent the Petitioners Palum and Zace and his daughters in this matter. I would like to try to reserve two minutes for rebuttal if I get the opportunity. All right. Keep track of the time on this. I will do so. Thank you, Your Honor. This is a petition for review. As the Court knows of a decision from the Board of Immigration Appeals summarily affirming a decision of the immigration judge denying asylum and withholding in this case. Our streamlining argument has been dealt with since we briefed it in Falcon Carice, I believe, and it collapses obviously into the merits, as the Court has noted. So I won't be addressing that further. But we believe the decision of the immigration judge of the Board of Immigration Appeals, and thereby the immigration judge, should be reversed for three main reasons. First of all, the immigration judge in this case applied an improper standard of proof in his decision. He stated clearly that he didn't believe persecution was a real possibility. Those are the words that he used. As the Court is aware, the standard is a reasonable possibility of persecution on account of an enumerated ground. Well, he used that, it seems like, sort of in passing, didn't he? He uses reasonable possibility in his kind of, I would call it the cut-and-paste part of his decision where he is reciting the law. But when he actually is making the decision, he says, I'm denying this because I believe he did not – there is not a real possibility here that he'll be persecuted in Albania. There is a difference. I think the government is arguing that this is semantics and nothing more in a footnote in their brief. But real means factual, in actuality. When we talk about being in real trouble, that means great trouble, severe trouble. Reasonable just means not absurd. Again, the Court has said that a one-in-ten chance can be enough for a reasonable possibility. That would not be the same as a real possibility. So we would argue here that the immigration judge, in fact, applied an improper standard of proof in this case by stating that there was not a real possibility of persecution. Additionally, somewhat related, the immigration judge found that the persecution, the past persecution in this case, was not severe enough to warrant a grant of asylum on humanitarian grounds under the appropriate regulations. In comparing the case with the matter of Chen, here we have a petitioner, Mr. Zays, whose father was executed when he was 13 years of age. He was denied entrance to high school. He was arrested and then imprisoned in a labor camp for five years with his wife, where his two daughters were born. He was forced to labor in the fields, as was his wife, after caring for the children every day. He was beaten on several occasions by government officials with clubs. He testified that escapees from this camp were executed, and he was aware of that. Testified that he was always hungry for the five years. Now, given those facts, if you compare them to the matter of Chen from the board, you have religious harassment in the matter of Chen, where a home was ransacked, a father was imprisoned and clearly humiliated in public. There were some terrible things that happened in Chen, but I believe Mr. Zays has suffered comparably here with the execution of his father. Mr. Chen's father also eventually died from his injuries from an incident where he was pushed into a bonfire. Mr. Chen was locked in a room with his grandmother, deprived of food, harassed, denied medical care, not allowed to attend school. Many of those same factors were present for Mr. Zays. Your argument only goes to the humanitarian ground, doesn't go to the, you know, the argument about the denial based upon the changed country conditions, right? We're not conceding that country conditions have changed, Your Honor. I believe we presented in our brief, in our argument, that the reports the judge relied upon are ambiguous. The government is arguing you should look at the profile of asylum claims. We relied heavily upon the State Department country conditions report, which are two different reports. They were issued the same year, about six months apart. Admittedly, the government, the report the government wants you to rely upon was six months later, and there were some significant changes. But that report indicates that the country had fallen into anarchy, essentially, because of the pyramid scheme, the collapse of the economy, and a change in government from the Democratic Party to the Socialist Party. Mr. Zays testified many of the Socialist Party leaders who were in power shortly after the Communists fell were actually former Communists and that he feared them. The report that the government relies on states that although there is no tradition of retribution for past anti-Communists, we're not arguing that the tradition here is significant. We're saying there's no tradition, that's not enough. Mr. Zays testified that he believed he would be persecuted in the future as well, based upon country conditions now. It also says that there were few instances, the record at page 277, few instances of such retribution. That means there are instances of retribution. We would submit that this record was not so clear that the immigration judge could rely upon it. And, in fact, he doesn't make an individualized analysis. He addresses it in one paragraph, goes into no analysis of what country conditions are now and how they apply to the respondent's application for asylum. So we would argue, again, he didn't make the necessary individualized analysis, as this Court has required, and that, again, we're not conceding that circumstances have changed so much in Albania that Mr. Zays no longer fears persecution. So I got the impression that the immigration judge assumed that he had, he was going to assume that there had been a showing of past persecution. He was really, notwithstanding all the translator problems and everything else, so he really was focused on changed conditions. And so your argument is essentially, then, that it comes down to the lack of individualized consideration? Correct. And I think if you look at his decision, again, he addresses it in just one paragraph. Without any real individualized analysis, he just says, circumstances have changed, and I find that based on the background materials. It doesn't tell us what exactly he's relying on, even. Finally, Your Honors, I believe that the denial of due process here, the translation problems that were endemic throughout this hearing, tainted the entire proceeding. The immigration judge spends about a page and a half addressing what he perceived to be evasiveness and embellishment by Mr. Zays. He clearly, he then gives him the benefit of the doubt and says, assuming. But what's the prejudice, given the way that the decision ultimately was made? Your Honor, I believe the prejudice is that, if we're talking about, going back to my, he should have been granted asylum on humanitarian grounds alone, that analysis focuses on the severity of the past persecution. If the immigration judge didn't give full weight to Mr. Zays' testimony, and I don't believe there's any way to argue that he did, given his comments, again, to this page and a half, he finds him, he doesn't find him to be incredible, I should say. I don't think he finds him to be credible. He does not find it to be incredible, but he does severely question. He says, I have problems with the evidence. He embellished. He was evasive. All of that goes to the weight that the immigration judge gave to Mr. Zays' testimony. And if he discredited that testimony, gave it less weight than he should have, that goes to the severity of the past persecution. He didn't really believe Mr. Zays was beaten with a club, perhaps. He didn't really believe that Mr. Zays went hungry for five years. Again, felt that he was embellishing. And all of that comes from the translation. It goes back to this incredible transcript, in my opinion, where the translation was just woefully inadequate. The translator brought it up that he didn't know how to translate certain words. Mr. Zays brought it up that he didn't understand the translator and that the translator wasn't translating everything that was being said. One of the attorneys brought the issue up on two different occasions, saying, let's continue this and get a translator that speaks the correct dialect. The translator said, this isn't, we don't speak the same dialect. There are words that I don't know that he's using. And the immigration judge says, well, does it make a difference? And he said, one small word can make a big difference when you're in court. That's what the translator said. The immigration judge said, let's go ahead. Where do the translators come from? What's the cadre of translators that are available? At this particular time, I believe it was through Berlitz Interpreting Services. They've changed the contract now. I'm in immigration court regularly. There's a different contract. There was a pool of translators that could have been called in and how quickly and what, what, this is a practical matter. Yes. This isn't like a comproval or a mom interpreter. I don't know if the court has seen those types of cases where there's one in the entire country or two. There had been an Albanian translator with the correct dialect who had translated earlier at a master calendar hearing, a preliminary type hearing in this case. And the attorney mentioned that. He said, I know that there's an attorney or there's a translator out there who speaks this dialect because they were here before. You've got about a minute left. You want to reserve it? I do, Your Honor. Thank you. Thank you, Your Honors, and good morning. I'm John Cunningham from the Justice Department, appearing on behalf of the Attorney General. Perhaps I should begin where my colleague ended, which is talking about the translation issue. In my opinion, there is no issue. My colleague would have you, in effect, step into the mind of the immigration judge, and there's just no way you can do that. Well, you can step a little bit in. I mean, the transcript does reflect a lot of frustration, both with the nature of the quality of the answers and the roundabout way of Mr. Zay's responding. It's clear that there's a tremendous amount of frustration on both sides. Yes. And so in that sense, I agree. We can't step into the mind. But to have a hearing where this man's life and freedom to stay here or not depend on it, it seemed to me that this was a hearing that was pretty close to out of control. And that's why I was curious about what's the big deal about getting a translator who could cut through that, which seemed to be a lot of the frustration that the IJ had. I think, Your Honor, though, that the law still requires that in order to overturn an asylum result on that ground, you have to have some. You're not answering my question. I'm sorry. My question is, what's the big deal about getting a translator? Oh, I think it could have been done. I think practically speaking, it could have been done. I'm sorry, Your Honor, I didn't mean to evade your point. That can be done. It is done from time to time. But I think having not done it here, the question is, what can the court do? And in order to have a remedy, you have to have before you some indication of what evidence was not brought forward before the immigration judge that would have been brought forward had the translation been better. And we have repeatedly asked for some indication from Mr. Zais, what did you not say that you would have said if the translation had been better? And he has never said, and my colleague has not identified either in his brief or this morning, what evidence Mr. Zais would have brought forward if the translation had gone smoother. The immigration judge eventually credited everything Mr. Zais said. And he did say that he did say that. And I suppose that takes care of the problem, at least on the you know, on the the first asylum ground based upon persecution and whether or not there's changed country conditions. But an argument can be made that one given given the overall attitude of the immigration judge and, you know, you can see why you would be impatient. But given that attitude, given his which may be is something more than a slip of the tongue about, you know, what standard govern, you know, an argument can be made that his his treatment of the application for asylum on humanitarian grounds was kind of given short shrift. Oh, I, I, I respectfully disagree, Your Honor. He did again say when he began his analysis of the Chen issue that again, I am assuming he said that the petitioner was credible on this ground. And he took into account everything that had happened to Mr. Zais in Albania, according to Mr. Zais' testimony. I refer the court, excuse me. This is at the bottom of page 62 of the record. It's page 16 of the immigration judge's decision and then going into the top of 17. He begins, as a matter of discretion, the court has examined the situation of the Respondent and, as indicated previously, assuming that his testimony should be granted full credibility, the immigration judge says, and then goes on to evaluate all the factors and the severity of the persecution and the humanitarian factors such as the Respondent's age, health and family ties. It appears that the court does not believe the discretion should be exercised favorably to the Respondent to allow him to receive the benefit of asylum in this case. And then he goes on to summarize the evidence. He says he acknowledges that Mr. Zais' father was executed, that he was made to work in hard labor with his family for five years. He took into account Mr. Zais' story. He credited it. He believed, he said he believed for purposes of this analysis, everything Mr. Zais said. And then he weighed the various factors, as he is supposed to do in these kinds of cases, and said, I do not find that in this case, this testimony rises to the level of severe past persecution so that Mr. Zais should be granted asylum regardless of any evidence of changed country conditions. In my view, that takes care of any translation issue because, again, we had heard nothing from Mr. Zais as to what exactly the immigration judge overlooked. So the question then reduces itself with respect to the Chen issue, whether Mr. Zais' history in Albania rose to the extreme level of persecution that he should be granted asylum regardless of what the current situation is in Albania. My colleague has summarized fairly the harms that Mr. Zais suffered in the labor camp, and I do not mean to challenge any of that. But on the other hand, there was some semblance of normal life in the camp, and I say that carefully. And because he met his wife in the camp, and they were allowed to marry in the camp, and they had two children in the camp, and he testified that there was medical care provided in the camp, that food was provided. He said he was hungry, but he also said that food was provided, and that schools were provided in the camp. Now, probably his children were too young while they were in the camp to attend school, but he did say that schooling was provided. This was not comparable, not fairly comparable to the life that Mr. Chen suffered when he was in the reeducation camp in China. That was forced labor and then brutal reeducation sessions. There was no medical care provided. The evidence in that case showed that Mr. Chen suffered injuries in the camp that left him permanently disabled. Nothing of that, like that, is on this record. The evidence in Chen also indicated that Mr. Chen was clinically depressed and suicidal, and there's no evidence of that sort in this case. So the immigration judge, I think, was well within his latitude as a fact finder in concluding that on this record, it was within his discretion to deny Mr. Zais a humanitarian grant of asylum under the Chen Doctrine, and I think it's consistent with this Court's cases. I can think of three. The Lau case that Judge Betty Fletcher wrote a few years ago. There, the petitioner was detained and imprisoned and interrogated by the Afghan secret police on suspicion of having been an informer for the Mujahideen. He was tortured with cigarettes. Urine was forced into his mouth. He was forced to watch while his wife was sexually assaulted, and his home was burned twice. And this Court concluded that that was sufficient to rise to the Chen standard. In the Vongsadi case, and I think Judge Nelson, you were on that case, there, the petitioner suffered a permanent disability. One of his thumbs was severed. And Judge Reinhart, writing for the Court, said that this is something that this person is going to have to live with for the rest of his life. He will have this constant reminder of what happened to him, and we find that that is sufficient to warrant a humanitarian grant of asylum. He should not be sent back to the country where that happened. And then finally, the Lopez Garcia case, which is a few years older, I think that was Judge Hawkins writing for the Court. There, the emphasis was on the fact that the petitioner had been raped repeatedly by, if I recall correctly, Salvadoran guards. And Judge Hawkins emphasized the lifelong trauma and mental distress that is associated with the act of rape. And he said we find that the immigration judge in this case didn't take that sufficiently into account. So the Court remanded to allow the immigration judge an opportunity to take another look at the facts of the case under that standard. We just don't have that here. And I do not mean to downplay in the slightest the fact that Mr. Zeis's freedom was taken from him for five years and he was made to work at forced labor in a labor camp. But that is not Chen. It is not Lal. It is not Vongsadi. It is not Lopez Garcia. And we, this is one area where I do need to make a strong claim for deference on the part of the Court toward the administrative fact finder. Because this is a case of looking at facts of the case and saying, well, this is or is not severe persecution. The immigration judge and the board, when they decide these kinds of cases, is interpreting the statute that Congress gave it to administer and interpreting their own regulations governing the doctrine of severe past persecution. And here you have a good decision by the immigration judge. He looked at the facts. He weighed the facts. And he came out to a result that was within his discretion and was within the latitudes of this Court's case law. And I urge the Court to uphold its decision. I have about 30 seconds left or more, if you, if the Honors wish. Let me just make one comment to go back to what you opened. It is true that looking at a cold transcript, we can't get inside the head of the IJ and you ask us to defer to the administrative judgment. When a record does reflect as much animosity in the proceeding, it's hard for me as a judge knowing that I go through the same process to say that if I get antagonistic towards someone whose fate I'm judging, it's a real act of will to overcome that, no matter what words one puts on paper or in a decision. So if nothing else, I hope that the, whatever process exists to check this kind of event, be it somebody saying, look, this is not the way to run a courtroom. And if there's a translation problem, get a different translator in there. Remove the cause of, at least part of the cause of the frustration. But I came away from this with a strong feeling that this IJ had let circumstances get outside his control. And I'm highly sympathetic to a witness who may be very uncooperative. But when it's clear, when everybody is saying there's a translation problem, that seems to be going to the fundamental part of a due process element of a immigration hearing, because these people don't speak English. My time is up, Your Honor, but I'll just comment, if I may, very briefly. Yes. And these are, these are close and difficult questions. And I think that's one reason why I brought the Court's attention to this recent decision in Singh, because there you had a split in the panel between the majority and I think it was Judge Hawkins writing for the, writing a dissent in which he essentially addressed the same concerns as Your Honor has. And people come out differently on these things. My only point in, in, in objecting to the notion that, that the Petitioner is asking you to step into the mind of the immigration judge is that the only, the only, the bottom line of my colleague's remarks was that the immigration judge could not have given adequate weight to my client's testimony. He must have given it short shrift. And you just don't have that in this decision. You don't have this on this record. All right. I thank the Court for its attention. Thank you, Mr. Cunningham. Rebuttal. Thank you, Your Honor. Just briefly, the Court in Hartooni said that the prejudice standard is showing that it potentially affected the outcome. Again, I believe with this immigration judge, the comments that he made in his decision, finding that the beatings that Mr. Zayas weren't sufficiently serious, when he said he'd been beaten by a club, it's hard to know what more could have come out with an interpreter. We know that, for example, the translator said that Mr. Zayas' father had been gunned down. It took some, some, some prodding, but we learned that that was an execution with a firing squad. That's very different than being gunned down. We know that, again, he was, he was beaten. He said he was beaten often with a club, but the immigration judge characterized that as beatings that he suffered were not sufficiently serious. And again, that's in the record at page 63, the same page that my colleague was reading from. This, this abuse was severe enough. His father was executed with a firing squad. He was in a labor camp for five years where he was beaten with a club and forced to work at hard labor in the fields. He was always hungry during that time. It's hard to compare severity, but I think no deference is due to this judge's decision, and I'm out of time. I apologize. No deference is due to this judge's decision based on the transcript, the animosity, the translation problems. And any reasonable person on the street would believe that they'd suffered severe persecution under these facts. Thank you. All right. Thank you. Thank both counsel for your excellent argument. Case is submitted for decision. Next case, also an immigration case of Pantovic versus Ashcroft.
judges: Tg Nelson, Tashima, Fisher